**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 12-cv-01334-CMA-KMT

CLINTON J. DAWSON, and
JANELL DAWSON,

      Plaintiffs,

v.

LITTON LOAN SERVICING, LP, and
OCWEN LOAN SERVICING, LLC,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
MOTION TO DISMISS**

---

      Plaintiffs Clinton and Janell Dawson bring this foreclosure-related action against Defendants Litton Loan Servicing, LP ("Litton") and Ocwen Loan Servicing, LLC ("Ocwen"), alleging claims for violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.* ("CCPA"), tortious interference with a contract and/or an expectancy, and intentional infliction of emotional distress arising out of Defendants' alleged failures to permanently modify Plaintiffs' home mortgage loan after providing them with a temporary modification.  Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).  Currently before the Court is Defendants' Motion to Dismiss. (Doc # 9.)  For the reasons discussed below, the motion is granted in part and denied in part.

## I. BACKGROUND

**A.    THE HOME AFFORDABLE MODIFICATION PROGRAM**[1]

In February 2009, the Secretary of the Treasury and the Director of the Federal

Housing Finance Agency announced the Making Home Affordable program (the

"MHA"), an effort to stem the then-prevailing foreclosure crisis.  *See The Making*

*Home Affordable Program,* Dep'ts of the Treasury & Hous. and Urban Dev.*,*

*http://www.makinghomeaffordable.gov* (last visited March 27, 2013).  As part of

the MHA, the Home Affordable Modification Program ("HAMP") was created.  *See id.*

Under HAMP, borrowers who are struggling to pay their mortgages can apply to their

loan servicer for a permanent loan modification to obtain a reduced monthly payment.

*Id.*

After a borrower applies for permanent modification, the loan servicer is required

under HAMP regulations to determine, based on financial information submitted by the

borrower, whether the borrower is eligible for a loan modification, which would reduce

the borrower's monthly loan payment to 31% of his gross monthly income.  *See id.*

The servicer then performs a Net Present Value test ("NPV"), which essentially

evaluates if it will be financially beneficial for the lender to reduce the monthly

payments.  *See id.*  If the NPV reveals that the modification is more valuable to the

lender than no modification, the servicer must offer a contract to the borrower.  *See id.*

If the modification would be less valuable, the loan servicer may take away the HAMP

---

[1]    The Court takes judicial notice of the following facts.

offer, which would require a "Non-Approval" notice to be sent to the borrower, along with other foreclosure prevention options.  *See id.*

Before a borrower receives a permanent modification, the loan servicer and the borrower enter into a three-month trial period, during which the borrower makes lower monthly payments toward his mortgage.  *See Cave v. Saxon Mortg. Servs., Inc.*, No. 11-4586, 2012 WL 1957588 (E.D. Pa. May 30, 2012) (unpublished), *vacated in part on other grounds on reconsideration*, No. 11-4586, 2013 WL 460082 (E.D. Pa. Feb. 6, 2013) (unpublished) (determining complaint was well-pled).  The terms of the trial period are governed by a form contract entitled "HAMP TPP" (the "TPP").  *Id.*

The TPP states that the borrower will receive a permanent modification agreement if: (1) the borrower's representations of his financial state continue to be true; (2) the borrower complies with the terms of the temporary payment plan; (3) the borrower provides all required documentation; and (4) the lender determines that the borrower qualifies. *The Making Home Affordable Program,* <u>Dep'ts of the Treasury & Hous. and Urban Dev.</u>*, http://www.makinghomeaffordable.gov/for-partners/ understanding-guidelines/Documents/mhahandbook_41.pdf* (last visited March 27, 2013).  During this trial period, the borrower makes three monthly payments of a reduced amount.  *Id.*  HAMP regulations require that loan servicers pre-qualify borrowers for a permanent modification before even entering the borrowers into a trial period contract.  *Id.*; *see also Cave*, 2012 WL 1957588, at *1 n.1.

**B.     PLAINTIFFS' TPP**

On about January 19, 2007, Plaintiffs borrowed $167,000 from a lender to secure the purchase of real property located in Grand Junction, Colorado.  (Doc. # 9 at 2.) Defendants, acting as loan servicers, were not party to Plaintiffs' contract with the lender, a securitized trust, but had a separate contract with the lender to service the loan.  (*See* Doc # 1.)  Plaintiffs allege that Defendants offered them a HAMP trial plan for assistance making payments, even though their loan was generally performing. (*Id.* at 4.)  Although not pled in the Complaint, according to the procedures required by TPP lenders, Plaintiffs were presumably pre-qualified for their TPP on the basis of verified financial information.  *See Cave*, 2012 WL 1957588, at *1 n.1.  According to Plaintiffs, they then abided by the requirements set by Defendants, including making on-time payments, and escrowing funds for taxes and insurance.  (Doc. # 1 at 4.) However, at the end of the trial plan, Defendant Litton informed Plaintiffs that they did not qualify for HAMP.  (*Id.*)  Because Plaintiffs had been paying reduced payments for three months, as allowed by HAMP, they were behind the regular payments for that period.  (*Id.*)  Further, the escrow account, which required payments from Plaintiffs during that time period, had additionally interrupted Plaintiffs' normal budget for paying their loans.  (*Id.*)

In early 2011, Plaintiffs became unable to make their full house payment on the due date.  (*Id.* at 5.)  Defendant Litton then sent Plaintiffs a "right to cure" letter but, according to Plaintiffs, when they attempted to cure, Litton demanded a higher price

than stated in the letter.  (*Id.*)  Foreclosure then ensued in July 2011.  (Doc. # 9 at 3.)

Plaintiffs claim Defendants made no attempts to explore alternative programs that

could avoid foreclosure, as required by HAMP.  (Doc. # 1 at 5-6.)

Plaintiffs generally assert that Defendants never intended to provide them

permanent loan modifications.  (*See* Doc. # 1.)  They further allege that Defendants

routinely failed to meet their obligations under HAMP by: thwarting implementation of

permanent HAMP modifications despite Plaintiffs being qualified; profiting by raiding

delinquent loans created after putting Plaintiffs on a trial plan and then denying them

HAMP; giving the false appearance of participating in "loss mitigation" but then

preventing Plaintiffs from attempting to cure their failed payment; insisting more was

due than stated in the right to cure letter; and initiating foreclosure quicker than industry

standards and before allowing Plaintiffs a chance to cure.  (*Id.* at 6-7.)

According to the Complaint, Plaintiffs' injuries include: payment of increased

interest; longer loan payment times; higher principal balances; deterrence from seeking

other remedies to address their default and/or unaffordable mortgage payments;

damage to their credit; additional income tax liability; costs and expenses incurred

to prevent or fight foreclosure; and emotional distress.  (*Id.* at 3-9.)

## II.  <u>STANDARD OF REVIEW</u>

### A.    RULE 12(b)(6)

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept

all well-pled allegations in the Complaint as true and view those allegations in the light

most favorable to the nonmoving party.  *Stidham v. Peace Officer Standards & Training,* 265 F.3d 1144, 1149 (10th Cir. 2001).  With regard to what must be pled to avoid dismissal, the Supreme Court in *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), described the standard that must be met as "facial plausibility."  In this context, "plausibility" refers to the scope and degree of specificity of the allegations in the complaint.  *Khalik v. United Air Lines,* 671 F.3d 1188, 1191 (10th Cir. 2012).  Although Fed. R. Civ. P. 8(a)(2) still requires the pleader to supply only "a short and plain statement of the claim," that statement must provide more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or generalized allegations of conduct that "encompass a wide swath of conduct, much of it innocent."  *Id.*  In this regard, the plaintiff must do more than articulate a set of facts that could "conceivabl[y]" or "possibly" give rise to a claim; he must "nudge his claims across the line from conceivable to plausible."  *Id.*  Of course, the degree of specificity required necessarily varies based on the context of the case.  *Id.*

## B.   PARTICULARITY IN PLEADING – RULE 9(b)

When a claim includes fraud as an element, allegations must be pled with particularity, as required by Fed. R. Civ. P. 9(b).  *HealthONE of Denver, Inc. v. UnitedHealth Group Inc.*, 805 F. Supp. 2d 1115, 1120–21 (D. Colo. 2011).  Typically, to satisfy Rule 9(b), a plaintiff must "set forth the time, place and contents of the false representation, the identity of the party making the false statements, and the consequences thereof."  *Id.* at 1121 (quoting *Koch v. Koch Indus., Inc.*, 203 F.3d 1202,

1236 (10th Cir. 2000)).  The particularity requirement is designed to afford a defendant "fair notice of the plaintiff's claims and the factual ground upon which they are based." *Id.*  At the same time, Rule 9(b) must be read in conjunction with the requirements of Fed. R. Civ. P. 8, which calls for simple and concise pleading.  *Id.*

### III. ANALYSIS

#### A.   CCPA CLAIM

Defendants first contend that the Complaint lacks well-pled facts alleging a "deceptive practice," a "public impact," or damages caused by their actions to support a CCPA claim.  (Doc. # 9 at 8-10.)  The Court disagrees.

The CCPA "was enacted to regulate commercial activities and practices which, 'because of their nature, may prove injurious, offensive, or dangerous to the public.'" *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003) (quoting *People ex rel. Dunbar v. Gym of Am., Inc.*, 493 P.2d 660, 667 (Colo. 1972)).  The CCPA prohibits a wide variety of "deceptive trade practices," including "mak[ing] false or misleading statements of fact concerning the price of goods" and "advertisi[ing] goods . . . with intent not to sell them as advertised."  Colo. Rev. Stat. § 6–1–105(1)(*i*),(*l*).  To effectuate its remedial purpose, the CCPA is to be "liberally construed."  *Dean Witter Reynolds Inc. v. Variable Annuity Life Ins. Co.*, 373 F.3d 1100, 1113 (10th Cir. 2004).

To adequately plead a CCPA claim, Plaintiffs must allege that: (1) Defendants engaged in a practice deemed deceptive under the statute; (2) the practice occurred in the course of Defendants' business; (3) the practice significantly impacts the public as actual or potential consumers of Defendants' goods; (4) Plaintiffs suffered an injury in fact; and (5) the deceptive trade practice was the cause of that injury. *Rhino Linings USA, Inc.*, 62 P.3d at 146–47.

### 1.   Deceptive Practice

The Court first turns to Defendants' argument that Plaintiffs fail to allege an unfair or deceptive practice. (Doc. # 28 at 7-8.) Under Colo. Rev. Stat. § 6-1-105(1)(e), a deceptive trade practice occurs when a person "knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alternatives or quantities of goods, food, services or property . . . ." Similarly, Colo. Rev. Stat. § 6-1-105(1)(u) defines a deceptive trade practice as a failure to disclose material information "known" at the time of advertisement or sale with the "intent" to induce the sale.

In their Complaint, Plaintiffs allege that: "Defendants, in the course of their business, misrepresented to Plaintiffs that they were complying with loss mitigation guidelines when it [*sic*] fact they were not but pretended to comply with loss mitigation guidelines while suppressing and failing to disclose the material fact that they were not." (Doc. # 1 at 15.) Further, Plaintiffs allege a pattern aimed at profiteering, which could lead to a conclusion of intent on the part of Defendants. (*See* Doc. # 1.)

8

These allegations sufficiently meet the unfair or deceptive practices element.

*See Belyea v. Litton Loan Servicing, LLP*, No. 10-10931-DJC, 2011 WL 2884964

(D. Mass. July 15, 2011) (unpublished).  Therefore, the Court finds that, if true, the

deceptive trade practices described, and the reasonable inferences that can be drawn

therefrom, plausibly mean that Defendants' dealings and communications were

deceptive.  Thus, this element is well-pled.

      2.   <u>Public Impact</u>

The Court next turns to Defendants' argument that Plaintiffs' allegations are

private in nature and do not extend to the public at large.  The Colorado Supreme Court

has established three factors to be considered in determining whether a challenged

practice significantly impacts the public as consumers: (1) the number of consumers

directly affected by the challenged practice; (2) the relative sophistication and

bargaining power of the consumers affected by the challenged practice; and (3) the

evidence that the challenged practice previously had impacted other consumers or had

significant potential to do so in the future.  *Rhino Linings USA, Inc.*, 62 P.3d at 146–47

(citing *Hall v. Walter*, 969 P.2d 224, 235 (Colo.1998)).

As alleged in the Complaint, Defendants' deceptive trade practices could

significantly impact the public as actual or potential consumers of Defendants' loan

services.  Plaintiffs claim that Defendants have an extensive presence in Colorado as a

large residential mortgage servicer with a "substantial number of consumers."  (Doc. # 1

at 15-16.)  They allege that Defendants' conduct was aimed at statewide profiteering

and was "mechanical." (*Id*).  Inherent in the HAMP application procedures, *supra*, the consumers of loan services have little-to-no bargaining power, in that they must accept the procedures or face default.  Given these factual assertions, which for purposes of the instant motion the Court accepts as true, *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007), the Court finds that Plaintiffs' allegations are sufficient to meet the public impact element of a CCPA claim.

       3.   <u>Damages</u>

       Finally, the Court turns to Defendants' argument that the damages suffered by Plaintiffs were not due to Defendants' alleged deceptive practices but, rather, were due to Plaintiffs' own default on their loan.  (Doc. # 28 at 6-7.)

       The Complaint alleges several injuries resulting from Defendants' purportedly deceptive representations about Plaintiffs' HAMP eligibility.  These injuries include putting Plaintiffs further behind on their debts and their budgeted money toward other expenses, such as the escrow account, and the loss of other economic benefits of the loan modification.  (Doc. # 1 at 4-7, 15-16.)  Additionally, Plaintiffs point to the actual foreclosure, which they allege could have been avoided via loss-mitigation efforts.  That is enough to sustain a claim of injury.  *See Rule v. Fort Dodge Animal Health, Inc.*, 607 F.3d 250, 255 (1st Cir. 2010) (holding any economic injury would have been sufficient to show damages).  Further, Plaintiffs allege "severe emotional distress" in addition to the financial injury.  (Doc. # 1 at 16.)  Plaintiffs state the emotional injury resulted from the

threat of losing their home.  (*Id.*)  Accordingly, Plaintiffs have pled sufficient facts to state a CCPA claim.

## B.    TORTIOUS INTERFERENCE WITH A CONTRACT AND/OR AN EXPECTANCY

Defendants next contend that Plaintiffs fail to allege facts of an "inducement and interference" to support a tortious interference with contract claim and, again, that Defendants did not cause any of the damages alleged.  (*See* Doc # 9 at 6-8.)  However, the Court again disagrees.

According to the Restatement (Second) of Torts**,** intentional interference with the performance of a contract by a third person occurs when one intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract. Restatement (Second) of Torts § 766 (1979).  The tortfeasor is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.  *Id.*

To prove tortious interference with a contract, a plaintiff must show that: (1) a contract existed; (2) the defendant had knowledge of the contract; (3) the defendant interfered and induced the other party to breach the contract; and (4) the plaintiff was injured as a result.  *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1115 (D. Colo. 2004) (citing *Westfield Dev. Co. v. Rifle Inv. Assoc.*, 786 P.2d 1112, 1117 (Colo. 1990)).  In the instant case, Plaintiffs also allege "tortious interference with an expectancy."  (Doc. # 1 at 7-11.)  While some

11

jurisdictions refer to this tort by the name Plaintiffs employ, Colorado refers to it as "tortious interference with prospective business relations."  *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995).  Plaintiffs and Defendants both cite cases relating to "prospective business relations," so the Court treats Plaintiffs' claim as alleging "tortious interference with prospective business relations."  Tortious interference with prospective business relations requires essentially the same elements as tortious interference with a contract, except that the former does not require an existing contract, only a "prospective contractual relation," and looks closer as to whether the interference was "improper."  *See* Restatement (Second) of Torts § 766B, cmts. a, d.

Defendants continuously assert that there is no valid tortious interference claim because, according to them, it was Plaintiffs who breached the contract by failing to make timely payments, and thus no connection could exist between Defendants' alleged interference and Plaintiffs' injury.  (*See* Doc. # 28.)  Yet, the Court reads the Complaint to the contrary.  Plaintiffs allege that Defendants induced them into entering the TPP, which caused them to fall behind on paying their loans, when they previously had not done so, and which eventually led to foreclosure.  (Doc. # 1 at 6-7.)  The Court will analyze Defendants' concern more specifically by individually addressing each of the elements they challenge.

1.   Inducement

Defendants assert that Plaintiffs failed to allege any facts demonstrating conduct that could constitute an inducement.  (Doc. # 9 at 7.)  The word "inducing" refers to

12

situations in which A causes B to choose one course of conduct rather than another. Restatement (Second) of Torts § 766, cmt. h.  Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is willing to suffer the consequences.  *Id.*  Essentially, inducement operates on the mind of the person induced, with the crux of an inducement being the actor's intent to cause the eventual result.  *Id.*  If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.  *See id.* at cmt. j.

In the instant case, Plaintiffs allege facts comprising an inducement which are sufficient to survive this motion.  Plaintiffs allege that Defendants held themselves out as being responsible for evaluating Plaintiffs' loan situation and for engaging in loss mitigation.  (Doc. # 1 at 3-4.)  Defendants presented the trial plan to Plaintiffs as a viable option, with the strong potential of Plaintiffs being able to enjoy lowered monthly payments on a permanent basis.  *See id.*  When HAMP was subsequently taken away from Plaintiffs after the trial plan was over, this allegedly resulted in greater debt for them.  *See id.*  While Plaintiffs then had the choice of continuing to make higher monthly payments, they were unable to do so.  In plain terms, the option presented to Plaintiffs – lower monthly costs with the ability to stay current on their home loan – could plausibly constitute an inducement.  According to Plaintiffs' Complaint, Defendants knew that they would later pull the rug out from underneath Plaintiffs, thereby putting Plaintiffs in a very

bad financial situation, which would cause them to default on their loan.  If these facts

are proven, a reasonable jury could conclude that an inducement occurred.

      2.   <u>Interference</u>

      Defendants further assert that Plaintiffs failed to allege how Defendants

interfered with their contract.  (Doc. # 28 at 7.)  A tortious interference claim arises

"if the actor . . . desires to interfere, even though he acts for some other purpose

in addition."  Restatement (Second) of Torts § 766, cmt. j.  "There is no technical

requirement as to the kind of conduct that may result in interference with the third

party's performance of the contract."  *Id.* at cmt. k.  "Interference with the third party's

performance may be by prevention of the performance, as by physical force, by

depriving him of the means of performance or by misdirecting the performance, as

by giving him the wrong orders or information."  *Id.*  While Plaintiffs respond to the

instant motion by going through the seven *Trimble* factors to show why Defendants'

interference was improper,[2] Defendants assertion is more fundamental – *i.e.*, they

claim that Plaintiffs' Complaint is totally devoid of facts alleging interference.  (*See* Doc.

# 9 at 6-8.)

      Defendants claim that their alleged misuse of HAMP and their purported

obstruction of Plaintiffs' attempts to cure are not related to the breach of Plaintiffs'

---

[2]   In determining whether an actor's conduct in intentionally interfering with the contract of another is improper, consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. *Trimble v. City & Cnty. of Denver*, 697 P.2d 716, 726 (Colo. 1985).

mortgage contract, for which they assert Plaintiffs are solely responsible.   Again,
however, Plaintiffs claim that their loan was "generally performing" before Defendants
interfered with the TPP.  Plaintiffs allege they would have been able to keep up with
payments if the offer and subsequent withdrawal of HAMP had not put them financially
behind.  Further, Plaintiffs allege that if Defendants had not misused HAMP, they might
have been able to continue to pay lower payments on a monthly basis.  Only after, and
because of, these actions by Defendants did foreclosure proceedings commence.
Therefore, Plaintiffs sufficiently pled facts that could prove Defendants tortiously
interfered by "misdirecting the performance, as by giving [Plaintiffs] the wrong orders
or information."  *See* Restatement (Second) of Torts § 766, cmt. k.

     3.   <u>Damages</u>

     Finally, Defendants contend that there were not any damages caused by their
alleged tortious interference.  (Doc. # 28 at 8.)  The analysis of the injury caused by
Defendants' alleged tortious interference is the same as for the damages caused by
their deceptive practices within the CCPA claim discussed previously by the Court.[3]
Therefore, consistent with the analysis above, the facts alleged by Plaintiffs sufficiently
set forth damages at this stage of the proceedings.  As such, Plaintiffs have validly
stated a tortious interference claim.

---

[3]   Alleged injuries include: putting Plaintiffs further behind on their debts and their budgeted
money toward other expenses, such as the escrow account; the loss of other economic benefits
of the loan modification; emotional distress from the threat of losing their home; and the actual
foreclosure, which Plaintiffs allege could have been avoided with loss-mitigation efforts.  (Doc.
# 1 at 4-7, 15-16.)

**C.**      **RULE 9(b) ANALYSIS**

The Court rejects Defendants' contention that Plaintiffs have not pled either claim with the degree of particularity required by Rule 9(b).  (Doc. # 28 at 3-5.)  To be sure, both the CCPA and tortious interference claims include allegations of fraud.  However, the Court does not apply the heightened pleading standard of Rule 9(b) to all elements of these claims.

The case repeatedly cited by courts as the authority for the proposition that a heightened pleading standard applies to CCPA claims is *Duran v. Clover Club Foods Co.*, 616 F. Supp. 790, 793 (D. Colo. 1985), in which the court held that "9(b)'s requirement of particularity applies to plaintiffs' allegations of deceptive trade practices under the [CCPA]."  As this authority indicates, Plaintiffs must plead with particularity the deceptive trade practice that Defendants allegedly engaged in, but they need not plead with particularity the other elements of the claim.  *D.R. Horton, Inc.-Denver v. The Travelers Indem. Co. of Am.*, No. 10-CV-02826-WJM-KMT, 2012 WL 527204 (D. Colo. Feb. 16, 2012) (unpublished).  Similarly, the heightened pleading standard only applies to the fraudulent inducement element of the tortious interference claim.

Since the misrepresentations Plaintiffs alleged are the same for both of these elements, the Court will address them together.  Like the plaintiff in *Martinez v. Nash Finch Co.*, 886 F. Supp. 2d 1212 (D. Colo. 2012), Plaintiffs base their allegation of deceit on both misleading affirmative representations and omissions.  Plaintiffs allege that Defendants were not complying with loss mitigation guidelines under HAMP while

misrepresenting to Plaintiffs that they were.  (Doc. # 1 at 5-7.)  Plaintiffs also allege that

Defendant Litton misrepresented their right to cure, sending a notice and then claiming

that Plaintiffs' payment was not enough, despite the fact that they purportedly met the

guidelines in the notice.  (*Id.* at 6-7.)  For these affirmative deceptions, the Complaint

does not identify the time and place of every misrepresentation that induced Plaintiffs to

enter into HAMP but, under the circumstances, the failure to allege such matters does

not deprive Defendants of meaningful notice of the grounds upon which Plaintiffs' claim

is made.  *See Martinez*, 886 F. Supp. 2d at 1217 (holding that the defendant was aware

of the contents of its own materials and, thus, could readily ascertain when and where

it used them, as well as further specific wording on business documents).  The events

that led to the foreclosure make it clear that, according to Plaintiffs, they were blindsided

by the idea that the HAMP program would be discontinued.  (*See* Doc. # 1.)  Further,

the Complaint is sufficiently specific about how the cure process was allegedly

deceptive – *i.e.*, that Defendant Litton sent a letter stating how Plaintiffs could cure but

then did not allow them to do so when they followed the directions in the letter.

Plaintiffs also assert a fraudulent omission.  Although Rule 9(b)'s requirement

of particularity in pleadings applies to claims of fraudulent omission, that standard is

modified somewhat because of inherent differences between omissions and active

assertions.  *Martinez*, 886 F. Supp. 2d at 1216 (citing *S.E.C. v. Nacchio*, 438 F. Supp.

2d 1266, 1277 (D. Colo. 2006)).  For claims premised on omissions, plaintiffs must

sufficiently identify "the particular information that should have been disclosed, the

reason the information should have been disclosed, the person who should have disclosed it, and the approximate time or circumstances in which the information should have been disclosed." *Id.* Here, Plaintiffs allege that they were induced into entering the HAMP program, which put them far behind on their loans when Defendant Litton unexpectedly informed them that they did not, in fact, qualify for HAMP.  (Doc. # 1 at 7.) When Defendants failed to explain to Plaintiffs that there was a good chance the HAMP program would not continue for them after three months and could, in fact, put them in a worse financial position, a fraudulent omission plausibly occurred.  (*See id.* at 3-4.)

Overall, throughout the Complaint, Plaintiffs allege that they were led to believe that they would be entitled to a permanent loan modification if they complied with their obligations.  (*See* Doc. # 1.)  Thus, the Court finds that the misrepresentations described, and the reasonable inferences that can be drawn therefrom, satisfy the particularity required by Rule 9(b).

## D.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Finally, Defendants argue that no "extreme and outrageous" conduct occurred to support a claim for intentional infliction of emotional distress.  (Doc. # 9 at 10-12.) On this argument, the Court agrees.

The tort of intentional infliction of emotional distress was first recognized by the Colorado Supreme Court in *Rugg v. McCarty*, 476 P.2d 753, 756 (1970).  In Colorado, "[t]he elements of outrageous conduct are: (1) the defendant(s) engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe

emotional distress, and (3) causing the plaintiff severe emotional distress." *Archer v. Farmer Bros. Co.,* 70 P.3d 495, 499 (Colo. App. 2002).

The first element, extreme and outrageous conduct, is satisfied if the conduct goes "beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Rugg,* 476 P.2d at 756 (citing Restatement (Second) of Torts § 46 (1965)). The Court views the totality of the circumstances in determining whether the conduct at issue was extreme and outrageous. *Kirk v. Smith*, 674 F. Supp. 803, 811 (D. Colo. 1987); *Spulak v. K Mart Corp.*, 664 F. Supp. 1395, 1397 (D. Colo. 1985). "The question of whether certain conduct is sufficiently outrageous is ordinarily a question for the jury." *Meiter v. Cavanaugh,* 580 P.2d 399, 401 (Colo. App. 1978). However, "it is for the court to determine, in the first instance, whether reasonable men could differ on the outrageous issue." *Blackwell v. Del Bosco*, 536 P.2d 838, 841 (Colo. App. 1975), *aff'd*, 558 P.2d 563 (Colo. 1976).

In Colorado, to state a claim for intentional infliction of emotional distress by outrageous conduct, a plaintiff must allege behavior by a defendant that is extremely egregious. *See Rugg*, 476 P.2d 753 (conduct was outrageous when a creditor engaged in a continuous campaign of harassment by calling its debtor several times, sending her numerous letters demanding payment of her debt, and informing her employer of the debt by asking how many garnishments the employer would allow from the debtor's salary); *see also Pearson v. Kancilia*, 70 P.3d 594 (Colo. App. 2003) (holding conduct outrageous when a male chiropractor threatened to stop treating a patient if she did not continue to have sex with him); *Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292

19

(Colo. App. 1982) (finding conduct outrageous where, despite knowing that the plaintiff "was peculiarly susceptible to emotional distress because she had witnessed her husband's suicide," the defendant car salesmen: demanded she return to the dealership when they realized a car had been sold to her for a loss; took the car back from her against her will; and followed her through the dealership, shouting, using abusive language, and physically threatening her).  It is clear that the "tort of outrageous conduct was designed to create liability for a very narrow type of conduct," *Green v. Qwest Services Corp.*, 155 P.3d 383, 385 (Colo. App. 2006), and that the "level of outrageousness required to create liability is extremely high," *Pearson*, 70 P.3d at 597.

In the instant case, the Court determines that Plaintiffs fail to meet this high standard as a matter of law.  Plaintiffs allege that Defendants offered the HAMP plan knowing it would not be permanent, interfered with Plaintiffs attempts to cure loans, and aggressively pursued foreclosure, while knowing "how emotional people are about losing their family homes."  (Doc. # 1 at 12.)  Although such conduct, as alleged, is deceptive and reprehensible, it does not "go beyond all possible bounds of decency" or rise to the level of being "atrocious . . . and utterly intolerable in a civilized community." *Destefano v. Grabrian*, 763 P.2d 275, 286 (Colo. 1988).  As alleged, no facts indicate that the correspondence between Plaintiffs and Defendants strayed from being professional and formulaic.  Also, while Defendants did hold a position of authority as Plaintiffs' loan servicers, they did not meet the "extremely high" threshold necessary to trigger liability for this tort.  *See Pearson*, 70 P.3d at 597.  Indeed, the facts of this case, as alleged, are similar to those in *Hewitt v. Pitkin County Bank & Trust Co.,* 931 P.2d

20

456, 459 (Colo. App. 1995).  In *Hewitt*, the plaintiff alleged that, on two separate occasions, his bank accepted loan payments from him and then reneged on its promise not to commence foreclosure proceedings against him, and instead commenced such proceedings the very next day.  *Id.*  The *Hewitt* court held that, "while such conduct, if true, may well be tortious, it does not rise to the level of conduct which may be characterized as "atrocious and utterly intolerable in a civilized community."  *Id.*  Here, the Complaint contains no substantive factual allegations of outrageous conduct that materially differ from the allegations in *Hewitt.  See id.*

Accordingly, Plaintiffs fail, as a matter of law, to state a claim for intentional infliction of emotional distress.

## IV.  **CONCLUSION**

For the foregoing reasons, it is ORDERED that Defendants' Motion to Dismiss (Doc. # 9) is GRANTED IN PART as to Plaintiffs' Third and Fourth Claims for intentional infliction of emotional distress, which are DISMISSED WITH PREJUDICE, and DENIED IN PART in all other respects.

DATED:  March   28  , 2013

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge