**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 12-cv-01334-CMA-KMT

CLINTON J. DAWSON, and
JANELL DAWSON,

      Plaintiffs,

v.

LITTON LOAN SERVICING, LP, and
OCWEN LOAN SERVICING, LLC,

      Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Plaintiffs Clinton and Janell Dawson bring this action for violation of the CCPA and for tortious interference which are related to foreclosure proceedings that took place in state court against Defendants Litton Loan Servicing, LP ("Litton") and Ocwen Loan Servicing, LLC ("Ocwen"). For the reasons discussed below, both claims fail as a matter of law and Defendants' Motion for Summary Judgment is granted.[1]

### I. BACKGROUND[2]

**A.    THE HOME AFFORDABLE MODIFICATION PROGRAM**

In February 2009, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program (the

---

[1] All actions alleged by Plaintiffs were taken by Defendant Litton.  Defendant Ocwen is named as a defendant only because it is the successor to Litton.  Thus, throughout this order the Court will refer to Defendants in the singular or as Defendant Litton.
[2] The following facts are undisputed, unless otherwise noted.  The Court will elaborate, as needed, in its analysis section.

"MHA"), an effort to stem the then-prevailing foreclosure crisis.  As part of the MHA, the Home Affordable Modification Program ("HAMP") was created.  Under HAMP, borrowers who are struggling to pay their mortgages can apply to their loan servicer for a permanent loan modification to obtain a reduced monthly payment.  *See The Making Home Affordable Program,* Dep'ts of the Treasury & Hous. and Urban Dev.*, http://www.makinghomeaffordable.gov* (last visited September 26, 2014)*.*

Before a borrower receives a permanent modification, the loan servicer and the borrower enter into a three-month trial period, during which the borrower makes lower monthly payments toward his mortgage.  *See Cave v. Saxon Mortg. Servs., Inc.*, No. 11-4586, 2012 WL 1957588 (E.D. Pa. May 30, 2012) (unpublished), *vacated in part on other grounds on reconsideration*, No. 11-4586, 2013 WL 460082 (E.D. Pa. Feb. 6, 2013) (unpublished) (determining complaint was well-pled).  The terms of the trial period are governed by a form contract entitled "HAMP TPP" (the "TPP").  *Id.*  The TPP states that the borrower will receive a permanent modification agreement if: (1) the borrower's representations of his financial state continue to be true; (2) the borrower complies with the terms of the temporary payment plan; (3) the borrower provides all required documentation; and (4) the lender determines that the borrower qualifies.  *The Making Home Affordable Program,* Dep'ts of the Treasury & Hous. and Urban Dev.*, http://www.makinghomeaffordable.gov/for-partners/understanding-guidelines/ Documents/mhahandbook_41.pdf* (last updated Dec. 13, 2012).

After a borrower applies for permanent modification, the loan servicer is required under HAMP regulations to determine, based on financial information submitted by the borrower, whether the borrower is eligible for a loan modification, which would reduce the borrower's monthly loan payment to 31% of his gross monthly income. The servicer then performs a Net Present Value ("NPV") test, which essentially evaluates if it will be financially beneficial for the lender to reduce the monthly payments. There are several tests employed to determine the NPV, but all formulas typically include consideration of several factors such as: cost of foreclosure; cost of modification; likelihood of default/ re-default; probability of cure for a modified vs. unmodified loan; type of loan; amount of unpaid principal balance; interest rate on the loan at origination; modifications; conditions of the property; remaining term of the loan; principal and interest before modification; borrower credit score; location of the property; insurance and taxes for the property; income of borrower; and home price projection. If the NPV test reveals that the modification is more valuable to the lender than no modification, the servicer must offer a contract to the borrower. If the modification would be less valuable, the loan servicer may take away the HAMP offer, which requires a "Non-Approval" notice to be sent to the borrower, along with other foreclosure prevention options. *See id.*

**B.    PLAINTIFFS' MORTGAGE LOAN, NOTE, AND DEED OF TRUST**

On January 19, 2007, Plaintiffs borrowed the principal sum of $167,000 (the "Loan") from Residential Acceptance Network, Inc. ("RAN"). In connection with the

Loan, Plaintiffs executed a Balloon Note,[3] dated January 19, 2007 (the "Note") in favor of RAN and its successors and assigns.  Under the terms of the Note, Plaintiffs promised to repay the Loan by making a principal and interest payment each month.  A failure to pay the full amount of each monthly payment under the Note constituted a "default" of the Note.

Plaintiffs also executed a Deed of Trust in connection with the Loan, dated January 19, 2007 (the "Deed of Trust"), encumbering real property located at 309 Hill Drive, Grand Junction, Colorado 81503 (the "Property") for the benefit of RAN and its successors and assigns.  Under the terms of the Deed of Trust, Plaintiffs irrevocably granted and conveyed all of their rights, title, and interests in and to the Property to the "Note Holder" as a security for the repayment of the Note.  The Deed of Trust advised Plaintiffs that "[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower" and that an entity known as a "Loan Servicer" may collect the "Periodic Payments due under the Note and this Security Instrument" as well as perform "other mortgage loan servicing obligations under the Note."  The Deed of Trust further provided that the "Lender" is not required to modify the obligations due under the Note or the Deed of Trust and that Lender's acceptance of any payments in amounts less than the amount then due shall not waive or preclude Lender from exercising his rights and remedies under the Deed of Trust including foreclosure.

---

[3] A balloon note is a type of loan which does not fully amortize over its term. Since it is not fully amortized, a balloon payment is required at the end of the term to repay the remaining principal balance of the loan.  *See* (Doc. # 62, Ex. 2).

Plaintiffs' Note and Deed of Trust (collectively, the "Loan Documents") were subsequently assigned and transferred to LaSalle Bank National Association, as Trustee for the C-Bass Mortgage Loan Asset-Backed Certificates,[4] Series 2007-CB4 (the "Trustee"). On March 30, 2007, Defendant Litton began servicing Plaintiffs' Loan.

**C.    PLAINTIFFS' DEFAULT AND ATTEMPTED LOAN MODIFICATION**

Plaintiffs defaulted under the Loan Documents by failing to timely make their monthly payment due October 1, 2007. On December 20, 2007, Defendant Litton offered Plaintiffs a temporary Repayment Plan to assist Plaintiffs to get current on their Loan, which remained due for the outstanding October 1, 2007 payment. Plaintiffs continued to attempt to make payments but, in April 2009, Plaintiffs requested a loan modification from Defendant Litton and submitted corroborating financial materials for review and consideration. On July 6, 2009, Defendant Litton sent Plaintiffs a letter advising them that it was "unable to provide an alternative workout solution because" Plaintiffs did not have "sufficient income to meet [their] monthly household expenses and pay the monthly payment for the referenced mortgage."

On July 9, 2009, Plaintiffs again requested a loan modification. In response, Defendant Litton sent Plaintiffs an application for a Litton Loan Servicing customized Modification Workout Plan package (the "Litton Workout Package"), which outlined certain steps Plaintiffs needed to complete in order to be considered for a loan modification. To meet the requirements of the Litton Workout Package, Plaintiffs

---

[4] On March 31, 2009, U.S. Bank, National Association was appointed as successor Trustee for the C-Bass Mortgage Loan Asset-Backed Certificates, Series 2007-CB4.

executed and delivered to Litton a Hardship Affidavit, dated July 23, 2009. Plaintiffs also executed and delivered to Defendant Litton a Litton Loan Workout Plan (Step One of Two-Step Documentation Process), dated July 24, 2009 (the "Litton Workout Plan"). The Litton Workout Plan had an effective date of August 1, 2009, and required Plaintiffs to, among other things, make three monthly trial period payments in the amount of $1,247.17 per month commencing on August 1, 2009. It also contained several provisions and terms which Plaintiffs expressly agreed to and acknowledged including the following:

> I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under the Plan."
> (Litton Workout Plan, p. 2, §(2)(G));

> I agree . . . [t]hat all terms and provisions of the Loan Documents remain in full force and effect; nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents. The Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Document.

On November 3, 2009, Defendant Litton sent Plaintiffs a letter notifying them it was still reviewing Plaintiffs' request for a loan modification but needed a "copy of the most recent bank statement including all pages (must be less than 90 days old)" to complete Plaintiffs' modification review. The letter also advised Plaintiffs that the trial period plan under the Litton Workout Plan had expired but, because Plaintiffs had made

each of their trial period payments, the letter also advised Plaintiffs that they qualified for "a one-time trial period extension" through December 31, 2009, "to allow additional time for the submission and review of the required documentation."

On December 10, 2009, Defendant Litton determined that Plaintiffs did not qualify for a customized modification with Defendant Litton because they did not have sufficient cash reserves or verified income to pay a modified mortgage payment.[5] Thus, on December 19, 2009, Defendant Litton informed Plaintiffs that they did not qualify for a permanent loan modification because their income was insufficient to support modified payments and they did not pass the NPV test. Plaintiffs continued to make some payments toward the Loan after receiving the December 19, 2009 denial letter, but they remained in default.

### D. FORECLOSURE

On January 18, 2011, Defendant Litton sent Plaintiffs each a Notice of Default and Intent to Accelerate letter advising Plaintiffs of their default under the Loan Documents and that, "[a]s of 1/18/2011, the total amount necessary to bring your loan current is $3,394.09." The notice further informed Plaintiffs that "[t]o cure this default" Plaintiffs had to "pay all amounts due under the terms of [the] Note and Deed of Trust." Plaintiffs did not send Defendant Litton the amount to cure the default. On February 16, 2011, Defendant Litton sent Plaintiffs another Notice of Default and Intent to Accelerate letter which indicated the amount to cure the default as of February 16, 2011 was $3,855.43. The notice also advised Plaintiffs that:

---

[5] A mortgage payment consists of the principal payment, interest, taxes, and insurance ("PITI").

> If you have not cured the default within forty five (45) days of this notice, Litton will accelerate the maturity date of the Note and declare all outstanding amounts under the Note immediately due. Your property that is collateral for the Note may then be scheduled for foreclosure in accordance with the terms of the Deed of Trust/Mortgage and applicable state laws.

Plaintiffs did not send Defendant Litton the amount to cure the default and in March, 2011, Plaintiffs ceased making any payments on the Loan.

As a result of Plaintiffs' failure to cure their default, a Notice of Election and Demand for Sale by Public Trustee ("NEDS") was issued on April 6, 2011 to initiate foreclosure proceedings of the Property with the Public Trustee.  On April 15, 2011, Defendant Litton sent Plaintiffs a Reinstatement Quote indicating the total amount to reinstate the Loan at that time.  On June 17, 2011, the Trustee filed its Verified Motion for Order Authorizing Sale Pursuant to Rule 120, Colorado Rules of Civil Procedure in the District Court for Mesa County, Colorado.  On July 8, 2011, Castle Stawiarski, LLC ("Castle"), the firm hired to foreclose the Property on behalf of the Trustee, sent the Public Trustee a reinstatement quote indicating that the total amount to cure the default was $15,753.12, exclusive of the Public Trustee's fees and costs.  Plaintiffs did not submit the reinstatement amounts to Defendant Litton or the Public Trustee.

On July 13, 2011, the District Court for Mesa County entered its Order Authorizing Sale, finding a "reasonable probability" that a "default exists" under the Loan Documents and authorized the Public Trustee to sell the Property at public auction sale scheduled for August 10, 2011.  On August 10, 2011, the Property was sold at a public auction foreclosure sale to the Trustee. On September 1, 2011, the Public Trustee

issued its Public Trustee's Confirmation Deed vesting "free and clear" title to the Property in the name of the Trustee. On September 7, 2011, the District Court for Mesa County approved the Public Trustee's sale of the Property to the Trustee.

Plaintiffs never cured the default under the Loan Documents prior to the August 10, 2011 foreclosure sale and did not file a notice of intent to cure with the Public Trustee.

On or about September 1, 2011, Defendant Ocwen began servicing the Loan upon the service transfer from Defendant Litton.

## II. **STANDARD OF REVIEW**

The purpose of a summary judgment motion is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S 317, 323 (1986). Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere

existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). After the movant has met its initial burden, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of the claim such that a reasonable jury could find in its favor. *See Anderson*, 477 U.S. at 248.

The nonmovant must go beyond the allegations and denials of her pleadings and provide admissible evidence, which the Court views in the light most favorable to the nonmovant. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Although the nonmoving party need not present evidence "in a form that would be admissible at trial," *Celotex*, 477 U.S. at 324, "the content or substance of the evidence must be admissible," *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995). However, conclusory statements based merely on conjecture, speculation, or subjective beliefs are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F .3d 869, 875 (10th Cir. 2004). Furthermore, "[h]earsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill.'" *Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242,

1246 (10th Cir. 2000) (quoting *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998)).

## III. DISCUSSION

This case is before the Court pursuant to diversity jurisdiction and the parties do not dispute that Colorado's substantive law applies.  As such, the Court will apply Colorado substantive law to Plaintiffs' claims for violations of the Colorado Consumer Protection Act ("CCPA") and tortious interference with a contract and/or expectancy. *Elec. Distribs., Inc. v. SFR, Inc.*, 166 F.3d 1074, 1083 (10th Cir. 1999).

### A.     COLORADO CONSUMER PROTECTION ACT

Plaintiffs allege that Defendant Litton violated the CCPA, Colo. Rev. Stat. §§ 6-1-101 *et seq.,* by:  (1) making false representations as to Defendant Litton's compliance with HAMP required loss mitigation guidelines in connection with Plaintiffs' loan and (2) making false representations in connection with alleged attempted payments by Plaintiffs to prevent foreclosure proceedings.

To establish a CCPA claim, Plaintiffs must establish, among other things, that "the defendant engaged in an unfair or deceptive trade practice." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003).  A deceptive trade practice requires a showing that the defendant knowingly made a misrepresentation or a false representation that had the capacity to deceive and that either "induce[d] a party to act, refrain from acting, or ha[d] the capacity or tendency to

11

attract consumers." *HealthONE of Denver, Inc. v. UnitedHealth Group, Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011).

In their Complaint, Plaintiffs allege that Defendant Litton misrepresented its compliance with HAMP's loss mitigation guidelines. (Doc. # 1, ¶¶ 39-40, 46-47.) Specifically, Plaintiffs contend that Defendant Litton "mechanically mov[ed] borrowers who [could] not make full timely payments to foreclosure sales" as "part of a nationwide and statewide pattern of conduct, aimed at profi[ting]." (*Id.*, ¶¶ 41, 48.) They also contend that when Plaintiffs contacted Defendant Litton in attempts to make payments to prevent foreclosure, they were given incorrect and extremely high numbers to pay to prevent foreclosure.

Pursuant to C.R.S. § 6-1-105(1)(e), a deceptive trade practice occurs when a person "knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alternatives or quantities of goods, food, services or property." Defendant Litton asserts that it did not knowingly make any false representation to Plaintiffs; that Plaintiffs were not given incorrect numbers; that the misrepresentation alleged by Plaintiffs is "contrary to the undisputed evidence in this case which conclusively demonstrates numerous and effective loss mitigation efforts by [Defendant] Litton from December 2007 to the foreclosure sale on August 10, 2011;" and that any representations or warranties that were made are barred by the credit agreement statute of frauds, C.R.S. § 38-10-124(2), unless they are in writing and signed. Defendant Litton also argues that Plaintiffs never attempted to make any additional

payments to prevent foreclosure and such allegations relating to alleged attempts to cure are false.  (Doc. # 62, 18.)

Plaintiffs have provided no facts to support that Defendant Litton engaged in an unfair or deceptive trade practice.  Plaintiffs have not demonstrated that Defendant Litton failed to comply with HAMP's required loss mitigation guidelines or that it misrepresented that it was complying.  Evidence shows that Defendant Litton did comply.  More importantly, the evidence does not demonstrate the existence of misrepresentations by Defendant Litton.  After Plaintiffs requested a loan modification, Defendant Litton provided Plaintiffs with an application for Plaintiffs to complete for a permanent loan modification.  While the application was pending Plaintiffs were provided a three-month period of reduced payments, and even received an additional month of reduced payment to allow Plaintiffs additional time to provide Defendant Litton with all required documentation to complete the permanent loan modification application.  Defendant Litton conducted an NPV test and, after determining that Plaintiffs did not qualify for the HAMP program, sent Plaintiffs a non-approval notice, along with other foreclosure prevention options.   Thus, Defendant Litton complied with the requirements of the HAMP program.

Plaintiffs incorrectly rely on an NPV worksheet which contains a dollar figure of $69,620.83 and appears to represent the difference between foreclosure and modification.  *See* (Doc. # 79 at Ex. 5).  Plaintiffs argue that Defendant Litton misrepresented the fact that Plaintiffs failed the NPV test, and instead contend that

Plaintiffs passed the NPV test "by some $69,620.83." (Doc. # 79 at 4.) However, an NPV calculation takes into account many additional variables not provided in the NPV Worksheet.[6] The NPV Worksheet does not indicate what additional variables were employed, nor does it provide a final result of the NPV test. As such, Plaintiffs' argument lacks supporting evidence.

Although Plaintiffs allege that, when Plaintiffs contacted Defendant Litton in attempts to make payments, they were given incorrect and extremely high numbers to pay to prevent foreclosure, they do not provide evidence of the alleged phone calls, the amounts quoted to cure default, or any other specifics about these alleged communications. Moreover, during the foreclosure proceedings Plaintiffs made no attempts to cure the default in any way and, in fact, concede that they ceased making any kind of payments in March of 2011, prior to the initiation of foreclosure proceedings in April of 2011.

There is no evidence demonstrating that Defendant Litton failed to comply with the loss mitigation guidelines, that it made a knowing false representation about its compliance, or that it made any misrepresentations with regard to Plaintiffs' alleged attempts to cure. Accordingly, the Court finds that Plaintiffs have failed to establish that Defendant Litton engaged in an unfair or deceptive trade practice.

---

[6] These additional variables include: cost of foreclosure; cost of modification; likelihood of default/re-default; probability of cure for a modified vs. unmodified loan; type of loan; amount of unpaid principal balance; interest rate on the loan at origination; modifications; conditions of the property; remaining term of the loan; principal and interest before modification; borrower credit score; location of the property; insurance and taxes on the property; income of borrower; and home price projection.

Because the Court finds that Plaintiffs have failed to establish that Defendant Litton engaged in an unfair or deceptive trade practice, Defendant Litton is entitled to summary judgment on this claim.

## B.    TORTIOUS INTERFERENCE WITH A CONTRACT AND/OR EXPECTANCY

With respect to Plaintiffs' tortious interference with prospective business relations claim, Defendant Litton contends that Plaintiffs do not provide evidence to demonstrate that Defendant Litton induced or interfered with Plaintiffs' contract.  *See* (Doc # 62 at 14-17).

According to the Restatement (Second) of Torts, intentional interference with the performance of a contract by a third person occurs when one intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract. Restatement (Second) of Torts § 766 (1979).  To prove tortious interference with a contract, a plaintiff must show that: (1) a contract existed; (2) the defendant had knowledge of the contract; (3) the defendant interfered and induced the other party to breach the contract; and (4) the plaintiff was injured as a result.  *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1115 (D. Colo. 2004) (citing *Westfield Dev. Co. v. Rifle Inv. Assoc.*, 786 P.2d 1112, 1117 (Colo. 1990)). To be actionable, "an interference with the performance of a contract must also be improper."  *Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984).  Improper conduct that falls short of causing a breach or total

impossibility of performance is still "actionable under the theory of intentional interference with contractual relations." *Slater Numismatics, LLC v. Driving Force, LLC*, 310 P.3d 185, 194 (Colo. App. 2012); *see also Ecco Plains, LLC v. U.S.*, 728 F.3d 1190, 1198-99 (10th Cir. 2013) (examining the role of the Restatement (Second) of Torts § 766 in Colorado for claims of intentional interference with contractual relations).

Plaintiffs also allege "tortious interference with an expectancy," which in Colorado is referred to as a "tortious interference with prospective business relations" claim. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995). Tortious interference with prospective business relations requires essentially the same elements as tortious interference with a contract, except that the former does not require an existing contract, only a "prospective contractual relation." Restatement (Second) of Torts § 766B, cmts. a, d.

Here, it is uncontested that the first two elements are met: a contract existed and Defendant Litton had knowledge of the contract. The third element of a claim for intentional interference with contractual relations requires that Defendant interfered with and induced the other party [here the lender] to breach its contract with Plaintiff. To meet this third element, Plaintiffs allege that:

1) "they had a reasonable expectancy that the securitized trust would modify or restructure their loan," and Defendant Litton interfered with that expectancy;

2) Defendant Litton misused the HAMP program "to put Plaintiffs in default rather than helping them avoid default";

3) Defendant Litton obstructed Plaintiffs' "attempts to cure"; and

> 4) Defendant Litton intentionally interfered with Plaintiffs' expectancy of loan restructuring by
>
>   a. "pretending to administer Plaintiffs['] HAMP application when it had no intent of administering it in good faith but instead intended to put on a pretext of administering it," and
>
>   b. "otherwise refusing in bad faith to participate in loss mitigation despite placing itself in the position to administer loss mitigation for the benefit of its client."

(Doc. # 1, ¶¶ 26-29.)

However, Plaintiffs have failed to provide any evidence to support any of these conclusory allegations. They provide no reason, legal or factual, as to why they would have a "reasonable expectancy that the securitized trust would modify or restructure their loan," let alone how Defendant Litton interfered with that expectancy. As discussed above, Plaintiffs also fail to demonstrate how Defendant Litton misused the HAMP program or how Defendant Litton was in any way responsible for Plaintiffs' failure to pay their mortgage. Plaintiffs fail to demonstrate that Defendant Litton did not comply with HAMP's loss mitigation requirements in any way. Plaintiffs also fail, as discussed above, to provide any evidence as to how Defendant Litton obstructed Plaintiffs' alleged attempts to cure. On the other hand, Defendant Litton provided evidence that Plaintiffs stopped making all payments on their mortgage as early as March of 2011, prior to the initiation of foreclosure proceedings in April of 2011.

Plaintiffs have failed to provide evidence to support either a claim of tortious interference with contract or a claim of tortious interference with prospective business relations. As such, Defendant Litton is entitled to summary judgment on these claims.

Because the Court is dismissing all claims against Defendant Litton, all claims against its successor Defendant Ocwen are also dismissed.

## IV. **CONCLUSION**

ACCORDINGLY, Defendants' Motion for Summary Judgment (Doc # 62) is GRANTED and all claims against Defendants Litton and Ocwen are DISMISSED WITH PREJUDICE. This Case is hereby DISMISSED, and judgment shall enter for Defendants Litton and Ocwen and against Plaintiff, with costs awarded to Defendants.

DATED: September 29, 2014

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge