**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:12-cv-01334-CMA-KMT

CLINTON J. DAWSON and
JANELL DAWSON,

        Plaintiffs,

v.

LITTON LOAN SERVICING, LP and OCWEN
LOAN SERVICING, LLC.

        Defendants.

_____

**MOTION TO ALTER JUDGMENT (Docs. 120 and 121) PURSUANT TO F.R.C.P. 59**
_____

**CERTIFICATION**

The undersigned certifies that, pursuant to D.C. Colo. L. Civ. R. 7.1(A), counsel discussed the grounds for this motion and the relief requested with Defendant's counsel on October 21, 2014. Defendants' counsel opposes the relief requested herein.

**APPLICABLE LEGAL STANDARDS**

A motion under Rule 59 is in order where, inter alia, "the court has misapprehended the facts." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). "Such a motion is therefore appropriate in cases where the court has based an order on a factual error." *Norman v. Arkansas Dept. of Educ.*, 79 F.3d 748, 750 (8th Cir. 1996). "Pursuant to Rule 59, a court should modify its judgment only where the moving party demonstrates that the Court has overlooked factual matters…that were presented to it on the underlying motion." *Perreca v. Gluck*, 262 F.Supp.2d 269,

1

272 (S.D.N.Y. 2003). Specifically, as applicable here, a district court should reconsider its grant of summary judgment if there is any basis to believe "that we failed to consider [relevant] deposition testimony…in determining whether genuine issues of material fact precluded granting the [defendants'] summary judgment motion." *Holley v. Leone*, 1987 WL 14512, *1 (E.D.Pa. July 27, 1987).

This Court's September 29, 2014 Order ("the opinion) hinges on its finding of an absence of any evidence to support Plaintiffs' claims. The opinion states at 13: "Plaintiffs have provided no facts to support that Defendant Litton engaged in an unfair or deceptive trade practice. Plaintiffs have not demonstrated that Defendant Litton failed to comply with HAMP's required loss mitigation guidelines or that it misrepresented that it was complying." The opinion (at 17) reaches the same conclusion with regard to the tortious interference claim. Critically, the Court made these finding while failing entirely to address the deposition testimony of Chris Wyatt, a former Litton executive who was an eyewitness to the misconduct alleged and who is now a nationally recognized whistle blower. As shown below, this testimony belies the factual conclusions stated in the opinion and directly supports Plaintiffs allegations. Accordingly, Plaintiffs respectfully request that the Court reconsider its ruling in light of this testimony.

Plaintiffs are mindful that, with the mortgage crisis, this Court is inundated with mortgage cases, many of which are meritless. This case is vastly different; Plaintiffs deposed *in this case* a prominent eyewitness executive whistle blower who has received some degree of notoriety in the press[1] to back up their otherwise substantial

---

[1] *See*, Wyatt Depo at 22, ln. 12-15 (quoted *infra*); **"**Homeowners Were Goldman Sachs' Other 'Muppets', http://www.americanbanker.com/bankthink/Greg-Smith-Goldman-Sachs-Litton-Loan-Servicing-1047575-1.html

circumstantial evidence to prove that Defendant Litton was soliciting modification applications and even trial plan payments when it in fact was just denying them as a matter of course to further a fraudulent scheme to recover Goldman's advances at the expense of the trust that actually owned the loan – precisely as alleged (and precisely as Defendants still have never actually denied).[2]

## CCPA

Plaintiffs allege that Defendants violated the Colorado Consumer Protection Act by falsely soliciting modification applications by informing consumers they could save their homes through loss mitigation, and by sending correspondence leading them to believe it was engaging in loss mitigation, when this was a lie since Litton and Goldman Sachs had a scheme to just deny them all. The Court aptly set forth the elements of a CCPA claim in the opinion as follows at 11-12:

> To establish a CCPA claim, Plaintiffs must establish, among other things, that "the defendant engaged in an unfair or deceptive trade practice." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003). A deceptive trade practice requires a showing that the defendant knowingly made a misrepresentation or a false representation that had the capacity to deceive and that either "induce[d] a party to act, refrain from acting, or ha[d] the capacity or tendency to attract consumers." *HealthONE of Denver, Inc. v. UnitedHealth Group, Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011).

There is no question that Defendant Litton made representations to Plaintiffs that would lead any reasonable consumer understandably believe that Litton was engaging in loss mitigation. Indeed, the Defendants' motion cites the affidavit of Gina Johnson

---

[2] Furthermore, regarding the opinion's discussion of interference with the cure (at 17), Janell Dawson explained in her affidavit how her loan did not include escrows, how Defendant set up escrows in the trial modification, how Defendant mishandled the escrows, and how when she called to inquire about curing she was told they would review the cure figures and send them, but they sent a foreclosure notice instead. (Janell Dawson Affidavit ¶¶ 5-12). The opinion also does not address or acknowledge that affidavit, and reconsideration is appropriate in this regard as well.

that affirmatively sets forth these representations with exhibits as to the detail. Moreover, Plaintiffs painstakingly demonstrated that these representations were false. (Doc. 79). SOF 25-26, 27, 29, 33-34, 36, 42, 46, 50, 51, 54 and 55-72. In particular, Plaintiffs cited affidavits and eyewitness deposition of a former Litton executive who testified on personal knowledge that Litton, on instructions from its parent Goldman Sachs, was denying *all* of these applications. Just a portion of Wyatt's testimony at 22-24 was:

> Q. So did Litton have what they call denial sweeps?
> A. Yes.
> Q. Can you tell the jury what denial sweeps were?
> A. Well, basically -- I'm going to talk about this because I did an interview with Lisa Meyers and NBC news on this issue. But, yes, they used them, and basically they would just sweep the portfolio and make mass denials.
> Q. By mass denials, you mean whether they were qualified or not?
> A. ***Meaning that even though we had the information, we didn't look at the loan for modification.***
> Q. And did that change after Goldman -- did that start happening after Goldman Sachs took over?
> A. Yes.
> Q. Were there some people from Goldman that would attend the executive committee meetings at Litton?
> A. Executive? I -- I assume so. I wasn't involved in an executive meeting.
> Q. Well, were you in meetings with Kevin Gasvoda, Ken Murphy, Tim Saunders and Tony Vaughn?
> A. Yes.
> Q. And what -- what kind -- did they talk about denial sweeps in the meetings?
> A. Yes.
> Q. And what did they say?
> MR. WILLIS: Objection to the form of the question, and hearsay.
> A. Well, you know, I guess if you want the management recording meetings, which will validate my answer to this, that I took during these meetings, they indicated that ***these denials had to be done in order to avoid potential issues with regulatory audits, staffing issues and the like***.
> Q. (BY MR. DRAZIC***) And this was to deny people, whether they were qualified or not?***
> A. ***Yeah***. I mean, in short, even though we had the information from a homeowner necessary to make a decision in connection with a loss or a loan modification, the system -- ***the servicing system was automatically to program that after the -- the request of the homeowner -- and I think if I***

4

> *recall correctly, I'd have to go back and listen to those meetings again, but there would be a -- like a 30-day window that a -- the system would automatically, if there hadn't been a decision made* on a modification, would automatically send a denial letter to the homeowner. (emphasis added).

With respect to these Plaintiffs' loan, Wyatt identified the "business plan" or NPV test. Chris Wyatt then testified at 15-16 of his deposition:

> Q. And do you recognize Plaintiff's Exhibit 1 as a Litton business plan?
> A. Yes.
> *Q. And how many of those have you seen in the past?*
> *A. Thousands.*
> Q. And does that test give two results with respect to the Dawsons?
> A. Based on my review, it gives one result.
> Q. Okay. What is that result?
> A. That the net present value of the loan, if it were modified, be -- would be $190,709.75.
> Q. Okay.
> A. And that is if you fore –
> Q. And what about if they foreclosed?
> A. Be $121,088.92, which means that it's in the best interest of the investor to modify the loan.
> Q. And in the -- the investor in this case was the trust?
> A. I guess. I -- I -- I -- I think this -- I think this loan was under trust. So it doesn't matter. **Whoever the investor was would show that it was better to modify the loan than foreclose.**
> ***
> Q. (BY MR. DRAZIC) Okay. **Now, in the ordinary course of the time you worked at Litton, would there have been any question as to whether this loan was modified?**
> *A. Based off this sheet of paper, my experience has <u>been it would have been modified.</u>* (emphasis added). Wyatt Deposition at 16.

Wyatt was an insider, had seen thousands of "business plans," and established classic "but for" causation by testifying that the Dawsons "would" have" been modified but for the Goldman scheme. Again, this testimony was coupled with the 30(b)(6) deposition testimony of Litton and Ocwen that never actually denied the scheme and that was able to provide no explanation of what occurred here except to invoke the phrase "investor guidelines." (Response, Doc. 79, *inter alia* SOF ¶¶ 62-64). Again, Wyatt even refuted

this. (Wyatt Deposition 35-39). This evidence more than proves the elements of the CCPA violation. And most important for current purposes is that the opinion's omission of any acknowledgement – not to mention discussion – of Wyatt's testimony objectively evinces an oversight of critical evidence and thus establishes a misapprehension of the facts warranting reconsideration. *See e.g. Perreca v. Gluck, supra.*

### b. Tortious Interference

Plaintiffs alleged that Defendant interfered with both Plaintiffs' contract with the trust by interfering with their attempt to cure and interfered with a prospective business advantage in a modification by pretending to engage in loss mitigation, but at all times in fact not doing so and instead denying all modifications. The Court again correctly set forth the elements of a tortious interference claim in the opinion as follows at 15-16:

> To prove tortious interference with a contract, a plaintiff must show that: (1) a contract existed; (2) the defendant had knowledge of the contract; (3) the defendant interfered and induced the other party to breach the contract; and (4) the plaintiff was injured as a result. … Tortious interference with prospective business relations requires essentially the same elements as tortious interference with a contract, except that the former does not require an existing contract, only a "prospective contractual relation."

Again Wyatt testified:

> Q. (BY MR. DRAZIC) Okay. **Now, in the ordinary course of the time you worked at Litton, would there have been any question as to whether this loan was modified?**
> ***A. Based off this sheet of paper, my experience has <u>been it would have been modified.</u>*** (emphasis added).

This testimony not only proved "prospective contractual relation" but also showed that there **"would"** have been a contractual relation but for the Defendants' scheme to deny

6

them all. Again, the opinion's omission of any reference to this core evidence can only be viewed as an oversight.[3]

## CONCLUSION

Wyatt's testimony that Litton was denying everyone for modifications whether qualified or not so that Goldman could get advances is direct evidence that the numerous letters Defendant Litton admits it was sending to the Dawsons and countless other borrowers representing that it was engaging in loss mitigation were false. This testimony provides admissible and indeed compelling evidence from which a reasonable jury could conclude, contrary to the conclusion stated in the opinion, that "Plaintiffs have provided no facts to support that Defendant Litton engaged in an unfair or deceptive trade practice." Further the testimony that Plaintiffs "would have been modified" in response to questioning as to whether there was "any question" about that fact, with its natural inference that the Dawsons should have received a modification, provides admissible and also compelling evidence from which a reasonable jury could conclude, contrary to the conclusion stated in the opinion, that

---

[3] On a separate matter, the opinion states in footnote 1: "All actions alleged by Plaintiffs were taken by Defendant Litton. Defendant Ocwen is named as a defendant only because it is the successor to Litton. Thus, throughout this order the Court will refer to Defendants in the singular or as Defendant Litton." This statement is inconsistent with the evidence in the record. Plaintiffs' response at 11-12 SOF ¶¶ 68-71 and at page19 details how Ocwen retained eviction lawyers previously retained by Litton with a conflict of interests to "represent" the trust who consistently rebuffed Plaintiffs' settlement attempts that would have benefited the trust. Further, they demonstrated how Ocwen agreed with New York regulators to re-examine these completed foreclosures as a condition of acquiring Litton. As such, Ocwen continued to interfere with the Dawsons' prospective advantage of a modification or other loss mitigation option. Confirming evidence on this issue was provided by Wyatt, who testified as to a culture of inordinate loyalty of foreclosure lawyers to servicers when they represent the trust by showering gifts upon them, including "spa days", "adult entertainment" and enough food to feed "a Third World country."(SOF¶ 69; Wyatt Depo. p 31 ln 15 to p. 33 ln 16).

Plaintiffs "provide no reason, legal or factual, as to why they would have a 'reasonable expectancy that the securitized trust would modify or restructure their loan'." Finally, Mrs. Dawson's affidavit regarding the Defendant's interference with her attempt to cure is at least sufficient to go to the jury but also was not addressed in the opinion, thus further requiring reconsideration. Based on the record of this overlooked evidence, the Court should grant the motion to reconsider and alter the judgment by setting it aside and denying summary judgment.

*/s/ Blair K. Drazic*
Blair K. Drazic
Colorado Bar #39879
321 Rood, Unit 2
Grand Junction, CO 81501
Phone 970-623-1193
Fax 888-858-0992
E-mail: blairdrazic@gmail.com

### CERTIFICATE OF SERVICE

A copy of the foregoing is served via the Court's ECF system.

/s/ Blair Drazic_____